----

(5 Misc. Rep. 337.)

## MYERS v. ROSENBACK.

(City Court of New York, General Term. October 20, 1893.)

1, LANDLORD AND TENANT—LEASE—FALSE REPRESENTATIONS—EVIDENCE.
   In an action on a lease, defendant pleaded that he was induced to sign the lease by false and fraudulent representations of plaintiff that the building was fit for the purposes for which defendant wished to use it, and that plaintiff knew at the time that they were false. *Held*, that evidence of the conversations and the representations made, which were the inducing cause, were admissible.

2. SAME.
   Evidence was admissible that the building was unsafe at the time of the making of the lease, and that plaintiff knew it.

3. SAME—RIGHTS OF TENANT—ABANDONMENT OF PREMISES.
   Where a landlord knows of secret defects in a building rendering it unfit for the purpose for which the tenant wishes it, and fraudulently conceals their existence from him, the tenant is not liable if for such cause he abandons the premises.

4. SAME—RATIFICATION OF LEASE.
   Where the tenant, on discovery of the defects, immediately complains to the landlord, and remains thereafter only on the assurance of the landlord that he will remedy them, and leaves when he fails to do so, it does not amount to a ratification of the lease.

5. SAME—INTENT—QUESTION FOR JURY.
   The intent of the landlord in making the representations is a question of fact for the jury.

Appeal from trial term.

Action by Frederick S. Myers against Moses S. Rosenback on a lease. Judgment for plaintiff. Defendant appeals. Reversed.

Argued before EHRLICH, C. J., and McCARTHY, J.

Horwitz & Hershfield, for appellant.
Hamilton R. Squier, for respondent.

McCARTHY, J. This is an appeal by the defendant from a judgment in favor of the plaintiff upon a direction of a verdict by the court, and from the order denying defendant's motion for a new trial. The plaintiff, in December, 1891, was the owner of certain premises, Nos. 205 and 207 East Ninety-Seventh street, New York city. The defendant at that time was, and for five years prior thereto had been, a manufacturer of corsets at New Haven, Conn. At that time the defendant desired to move his factory to New York city, and, in the course of his search for a suitable building for that purpose he came across one owned by the plaintiff on Seventy-Fifth street. The defendant was directed

by the person in charge of this building to see Mr. Myers, the plaintiff, in reference to renting it. The defendant thereupon, as the evidence shows, called by appointment, previously made, on Myers, the plaintiff, at Myers' office, in company with his salesman Schwartz. The defendant, Rosenback, at this interview with the plaintiff told the plaintiff that he (the defendant) wanted to have a building to manufacture corsets, and had looked at plaintiff's building in Seventy-Fifth street. The plaintiff replied, "You cannot have that Seventy-Fifth street place, because the building is let to another party. I have a place in Ninety-Ninth street, much more suitable." Then they made an appointment to look at the Ninety-Ninth street building, and, pursuant to this appointment, the plaintiff, the defendant, and the defendant's salesman, Schwartz, met there with a view to making arrangements for leasing the place should it prove suitable. The defendant told the plaintiff that he observed there was no power in the Ninety-Ninth street building to run an engine, whereas the Seventy-Fifth street building was supplied with power, and he required an engine and boiler, and that he preferred the Seventy-Fifth street place. The plaintiff told him that the Ninety-Ninth street building was a better building, and that he would guaranty that it would hold 50 horse power, even in the weakest point of the building. The defendant said that he had an engine and boiler in New Haven, and that, provided that plaintiff's building was strong enough, he would put this engine and boiler up in this building. This engine was an ordinary seven horse power engine, which was running as many machines as the defendant then required in the manufacture of corsets. The plaintiff suggested that, as it would involve a good deal of trouble to bring the engine down from New Haven, and cost a good deal to set it up, it would be cheaper for the defendant to buy a gas engine. The defendant acquiesced in this suggestion, and at the further suggestion of the plaintiff went with him to one Hahner's, who had a gas engine, which the plaintiff was desirous that the defendant should see. After examining this gas engine the defendant concluded to take the plaintiff's suggestion, and purchase such an engine for use in his factory. The plaintiff had even suggested to the defendant that, as the defendant was going to increase his business, he might put a larger engine in, and advised him to put in a fifteen horse power engine, so that he could sublet his power to any other tenant in the building who might desire power. The defendant said that he did not care to make any money that way; that all he wanted was to run his machines, and that a seven to ten horse power would do that. In all these interviews the uncontradicted testimony shows that the plaintiff, in order to induce the defendant to lease the building, kept continually telling the defendant that the building was strong enough for the defendant's wants and purposes, and that he, the plaintiff, would guaranty that it would be strong enough even in the weakest point in the building, which was over the stairs. Relying upon the truth of these statements made by the plaintiff, that the build-

ing on Ninety-Ninth street was of sufficient strength to support the engine for the generation of steam power required by the defendant in his business, and that it was so constructed that it would sustain the weight and pressure of such engine for the generation of power, the defendant was induced to sign a lease of the premises for four years and one month from the 1st day of January, 1892, at the yearly rent or sum of $1,400 a year. After the execution of this lease the defendant bought an engine of the character which the plaintiff had pointed out to him as being suitable for his purposes, and took possession of the premises, and started to fit up his factory. He occupied the fourth and fifth floors of the building, and about the 1st day of January, 1892, proceeded to remove his factory from New Haven to New York, together with all his machinery and stock, and proceeded to fit it up for use by his employes, some 40 in number. After the gas engine purchased at plaintiff's suggestion had been set up in the front part of the building, at the first turn of the wheel the building began to vibrate, and the shock was so perceptible that it interrupted the work of all the people in the building, and caused many of the hands to become sick. The defendant at once stopped his engine, and notified the plaintiff of the situation of affairs. The plaintiff called at the defendant's premises, saw how the engine worked, and suggested to the defendant that the engine be removed to one side of the position it then occupied, and in accordance with this suggestion of the plaintiff, the engine was set back on the very spot where the plaintiff indicated. The engine, thus removed to another spot, was then again set to work, with the same effect as to vibration of the walls as before. It shook so much that the people occupying the adjoining premises could not do any work at all, and threatened to move out, in fear of their lives, and in fear that the building was going to tumble over on them. The defendant again notified the plaintiff to come up and see for himself how bad matters were. At this interview the defendant said to the plaintiff: "I cannot stand this interruption to my business. I have all my hands, and they all work on piecework, and if I want to keep them I shall have to pay them by the day for piecework, whether they work or not, in order to keep them together." The defendant further said: "I want you to keep this building in shape so that I can work." The plaintiff then suggested that some lumber be bought, and that his carpenter would place uprights on the floor so as to brace up the ceiling. The plaintiff's carpenter did place these uprights in the way that the plaintiff had indicated and directed should be done. When this was done, the engine was set to work again, but vibrated as much as ever, if not worse. The plaintiff was again notified of the condition of affairs, and, at his suggestion, his own carpenter wedged the braces that he had previously put up, so as to make them tight. This, however, did not improve matters; the vibration continued to be as strong as before. The plaintiff then said: "We will try one more thing. * * * We will take the engine

and put it down stairs." In this the defendant acquiesced, and said: "All right. I will do anything to suit you. I want to get this factory going, because it is money out of my pocket. I am losing daily. I am losing trade." The plaintiff and defendant then arranged to lower the engine to the floor below. The plaintiff's architect came to the defendant's place of business, and showed the machinist where the engine should be placed, and marked out the identical spot where he wished the engine set. The defendant then had the engine moved from the fifth floor to the fourth floor, and set on a platform just where plaintiff's architect had marked out the spot where he desired the engine placed. The engine was then again set to work. It vibrated more than it did before, when in its former position on the floor above. Every time the engine made a move every beam in the building moved, and the entire building vibrated worse than it had ever done before. The windows rattled continually; the merchandise on the shelves tumbled off; boxes piled up on shelves fell down. The shaking was so strong and pronounced that it was impossible to continue business in that factory. The defendant could not keep the machines in order at all; the sewing machines got out of gear. The machinist found it impossible, with the vibration, to get the machines started. It made the people dizzy to walk through the building and see it. The defendant, after complying with the plaintiff's suggestion to put the machine on the fourth floor in the very spot where the plaintiff's architect had designated, again sent for the plaintiff, and told him that he could not any longer stand this state of affairs. He showed him how the building shook, and for this purpose started up the machine. When he called the plaintiff's attention to the vibration caused by the running of the machine the plaintiff shook his head and said: "I don't know. I cannot fix it." As the last resort, the plaintiff suggested that the defendant should obtain permission from the party occupying the lower floor and cellar to place the engine in the cellar. The defendant endeavored to obtain this permission, but failed. He then reported to the plaintiff that he was unable to obtain permission to make use of the cellar, and the plaintiff said, "I don't know what we can do." These changes and experiments and moving the engine from place to place as suggested by the plaintiff went on until about June 1st. On June 2, 1893, the defendant received notice from the building department that his gas engine was rocking the building to such an extent as to disintegrate the walls, and he was required to discontinue the running of the engine at once. This was a joint notice from the building department addressed to the plaintiff as owner of the building, and to the defendant as lessee. This notice was served on the defendant on the 3d day of June, and on that day he surrendered possession of the premises to the plaintiff, and moved out, it being impossible for him to continue his business without the use of motive power to generate the steam necessary to run his machines.

The testimony on behalf of the defendant showed that during

-all this time he suffered great difficulties in the conducting of his business, which was interrupted by the frequent changes of the engine, necessitating the stopping of all work. Orders taken by the defendant's salesmen could not be filled, because the defendant could not manufacture the goods for which orders had been taken. Salesmen who were on the road soliciting orders at expensive yearly salaries were called back to New York, and were kept idle during the busy season, because of the inability of the defendant to make and deliver the goods which the salesmen were selling. The defendant was also subjected to other expenses by being compelled to move to other quarters at a higher rental, the rent of the new place being $1,800, while that of the plaintiff's premises was only $1,400. This action was brought to recover the rent for the month of June, 1893. The answer sets up the defense that the defendant was induced to lease the premises by means of the statements and representations of the plaintiff, known to him to be false, that his building was suitable in every respect for defendant's business, and that it would sustain the weight and pressure of such an engine, even a fifty horse power one, as the defendant would require. The defendant also set up a counterclaim of $2,000 for damages sustained by him in being compelled to remove. Upon the trial of the action the defendant offered to prove the defective condition of the building in the year 1890 by expert builders, who had thoroughly examined the same in that year, and who found that it was imperfectly constructed, and that the defects were such as to render it unsafe for occupancy, the defects being in the foundation walls and in the stone wall resting upon the foundation, and that the plaintiff knew of these defects. The defendant also offered to prove by one John Drew, who was a house mover, and had been in that business for 30 years, and was thoroughly familiar with the shoring up and strengthening of buildings and work of that character, that in December, 1891, he was employed by the plaintiff to examine the building on Ninety-Ninth street, and that he had discovered it to be unsafe and insecure, and that, by the plaintiff's direction, he proceeded to endeavor to make the building secure by underpinning it, but was prevented from doing anything to the building by the refusal of a tenant occupying the lower portion of the same to allow him to enter. The defendant offered to prove by the same witness that, after the defendant was compelled to leave the premises, the witness Drew was employed by the plaintiff to make the building secure by underpinning and doing work on the lower walls, and that he did so work on the premises. All these offers were excluded by the court on the ground that they were immaterial and irrelevant, but not on the ground that they were made in the form of an offer. The defendant also offered to prove by the witness Loomis that it was not the fault of the gas engine, or anything connected with it, that caused the vibration. The defendant also offered to prove by the witness August Schweitzer, an inspector of buildings of the building department of the city

of New York, that during the months of February, March, April, and May, 1892, he inspected the premises in question, and found that they were so badly constructed as to render the building utterly unsafe and unfit for occupancy, and dangerous to life and limb, and that such was the condition of the building at the time the defendant Rosenback abandoned the premises. The defendant also offered to prove by the same witness that this condition of the building, as discovered by him, was communicated to the plaintiff immediately after the witness himself had discovered it. These offers were also rejected by the court on the ground that the testimony was immaterial and incompetent, and not for the reason that they were made in the form of offers; the defendant duly excepting to the court's ruling. The defendant also offered to prove by the witness Schwartz that prior to the making of the lease of the premises in question the plaintiff, in the presence of the witness, represented to the defendant that the Ninety-Ninth street building was perfectly safe and sound, and able to hold such machinery as the defendant described, or that he required the building for, and that the defendant explained fully to the plaintiff the purposes for which the defendant required the building, and stated to the plaintiff that unless the building was fit for such purposes it was useless to the defendant; that the plaintiff thereupon warranted the building to the defendant as safe and sound, and as thoroughly fitted to hold such machinery as the defendant required for his business; that the plaintiff so warranted it to the defendant as an inducement to enter into the lease, and that the defendant relied on such recommendations and statements, and was induced by means thereof to execute the lease. It was also offered to prove by the same witness that this warranty and representations were false and untrue, and known to the plaintiff to be so. This offer was also rejected by the court on the ground that it was incompetent and irrelevant. The present appeal presents to this court the correctness of the rulings of the court below in rejecting the various offers of proof as above detailed, to all of which the defendant duly excepted; and also presents the exceptions to the rulings of the court in denying the request of the defendant to go to the jury upon the question as to whether or not the representations made by the plaintiff were false and untrue, and as to whether the defendant relied upon these representations, and by reason thereof was induced to enter into the lease; and whether they were material representations. The defendant also asked leave of the court to submit to the jury whether the representations made by the plaintiff were false and untrue, and that if, by reason of these representations, the defendant was induced to forbear making other investigations or inquiry as to the premises, a verdict should be directed for the defendant. The defendant also asked for leave to go to the jury upon the question of the warranty by the plaintiff as to the condition of the building, and upon the question whether the warranty was given, and, if such warranty was given, and the facts were other than as warranted, and

that the facts other than as warranted were material facts, that a verdict should be rendered for the defendant. The defendant also asked leave to go to the jury upon all the evidence in the case. These motions were all denied, however, and the defendant excepted to the refusal as to each of them seriatim, and excepted also to the court's granting the motion for a direction of a verdict. The court, on motion of the plaintiff, directed a verdict in favor of the plaintiff. From the judgment thereafter entered in favor of the plaintiff, and from the order denying the motion for a new trial, the defendant appeals to this court. Inasmuch as the trial justice in passing on the questions raised by the exceptions did not intimate any special ground for his ruling, and in directing a verdict for the plaintiff did not render any opinion, we are to assume that the ground for such rulings and directions was an attempt on the part of the defendant by such evidence to alter or vary the terms of the lease in question, and that all conversations had prior to or at the time of making the same was merged therein; but the evidence presented and the proof offered and which was rejected was not for such purpose, and did not alter or vary the written instrument. By the pleadings it was admitted that the lease set forth had been made and signed, and, if a valid contract, the defendant was liable; but it was claimed by the defendant that by reason of false and fraudulent representations made by the plaintiffs, and which were known to the plaintiff at the time, he (defendant) was induced to and did sign such lease. Then this presented an entirely different question, and could be proved only by evidence of the conversations and representations made, and which were claimed as the inducing cause. We think the court erred in its rulings, and that the evidence was competent, and, being competent, was certainly material, in order to prove defendant's entire case. They were not mere opinions, but rather the representations and statements of a material fact, to wit, the conditions of the building for the purposes of the defendant, (see Hickey v. Morrell, 102 N. Y. 454, 7 N. E. Rep. 321;) and this was then a fraud by the plaintiff by which the defendant was induced to assume the lease, (Railway Co. v. Tyng, 63 N. Y. 653,) and this is shown particularly by the offer of evidence in which would have been proven that plaintiff had knowledge of the defective and unsafe condition of the building at the time of the making of the lease. Fraud vitiates every contract, no matter how solemn. The representations were relied on by the defendant. Follett, C. J., in Daly v. Wise, 132 N. Y. 311, 30 N. E. Rep. 837, says:

"In case the owner of a dwelling knows that it has secret defects and conditions rendering it unfit for a residence, and fraudulently represents to one who becomes a tenant that the defects and conditions do not exist, or if he fraudulently conceals their existence from him, the lessee, if he abandons the house for such cause, will not be liable." See Jackson v. Odell, 12 Daly, 345; Bennett v. Judson, 21 N. Y. 238.

And where a tenant continues in occupation, but did so under the assurance of the landlord that the cause of the complaint

should be removed, his continuance is not of such a nature as to amount to an adoption of the contract, or to make the tenant liable for the payment of the rent for the period while in actual occupation. Wallace v. Lent, 1 Daly, 481. In the case at bar the defendant constantly complained of the condition of the building, and at the request and solicitations of the plaintiff made changes from place to place on the assurances of the plaintiff to remove the cause. Defendant removed from the premises when the plaintiff failed. There was no act in affirmance of the contract. The right to rescind on the part of the defendant when he discovered the fraud was not lost. It was simply held in abeyance by the order of the plaintiff to remove the engine from place to place, and the assurance given to remove the cause. Improvement Co. v. Chapman, 118 N. Y. 295, 23 N. E. Rep. 187; Gould v. Bank, 99 N. Y. 333, 2 N. E. Rep. 16. The correctness of the rule being now shown that the defendant had a good defense by reason of the false and fraudulent representations, and that the evidence was admissible and proper, it was error, then, for the court not to submit the questions of fact to the jury, as requested by defendant's counsel. There was sufficient evidence, and whether a representation is merely an expression of opinion or relief, or an affirmation of a fact to be relied upon, is a question for the jury. Simar v. Canaday, 53 N. Y. 298, 306, 307; Meyer v. Amidon, 23 Hun, 553. It is well settled that, even where a statement is made by a party who assumes or intends to convey the impression that he has actual knowledge of its truth, being conscious that he has no such knowledge, and knowing the inquirer relies and is about to act upon his statements, and of the injury sustained, the party making the same intended to deceive and defraud the injured party. The intent is, of course, a question of fact to be found by a jury, and not one of law to be disposed of by a court. Meyer v. Amidon, 23 Hun, 553. We have examined the authorities carefully, presented by the respondent, but do not think they bear out his contention. For these reasons the judgment should be reversed, and a new trial granted, with costs to the appellant to abide the event.